# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE
# IN AND FOR NEW CASTLE COUNTY

ANAJAI CALCAÑO PALLANO, et al., )
)
     Plaintiffs, )
)
     v. )     C.A. No. N09C-11-021 JRJ
)
THE AES CORPORTATION, et al., )
)
     Defendants. )

Date Submitted: October 27, 2015
Date Decided:  November 24, 2015

*Upon Defendant AES's Daubert Motion to Exclude the Testimony of William P. Konicki*: **DENIED.**

Ian Connor Bifferato, Esquire, David W. deBruin, Esquire, Kevin G. Collins, Esquire, and J. Zachary Haupt, Esquire, Bifferato, LLC, Wilmington, Delaware; of counsel: Steven J. Phillips, Esquire, Diane Paolicelli, Esquire, and Philip Monier III, Esquire, Levy Phillips & Konigsberg, LLP, New York, New York; Robert T. Vance, Jr., Esquire, and Giovanni O. Campbell, Esquire, Law Offices of Robert T. Vance, Jr., Philadelphia, Pennsylvania, Attorneys for Plaintiffs.

Timothy Jay Houseal, Esquire, and William E. Gamgort, Esquire, Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; of counsel: Dane H. Butswinkas, Esquire, R. Hackney Wiegmann, Esquire, John M. McNichols, Scott K. Dasovich, Esquire, James Gillenwater, Esquire, and Lucas E. Beirne, Esquire, Williams & Connolly LLP, Washington, D.C., Attorneys for Defendants.

**Jurden, P.J.**

# I. INTRODUCTION

This litigation arises out of the alleged unlawful dumping of toxic industrial waste ("Coal Ash Waste" or "Waste") in the Dominican Republic by The AES Corporation ("AES") and four of its wholly owned subsidiaries, AES Atlantis, Inc.; AES Puerto Rico, LP; AES Puerto Rico, Inc.; and AES Puerto Rico Services, Inc. (collectively "Defendants").[1]  Plaintiffs, residents of the Dominican Republic, allege they were "wrongfully exposed to reproductive, carcinogenic, and other toxins in the Coal Ash Waste, either directly or *in utero*, and as a result suffered severe personal injuries, including birth defects and death."[2]  These birth defects include, but are not limited to, conjoined twins, missing limbs, missing organs, internal organs extruding from the body, cranial and bony malformations, central nervous system injures, and gastrointestinal deformities.[3]

The *Daubert* motion *sub judice* is just one of nineteen[4] filed by the parties in this hotly and heavily litigated dispute.[5]  At issue in AES's *Daubert* Motion No. 10

---

[1] Second Amended Complaint ¶¶ 1, 4 ("SAC") (Trans. ID. 40099941).

[2] *Id.* ¶ 16.

[3] *Id.* ¶ 2.

[4] The parties have filed fifty-four briefs in connection with the nineteen *Daubert* Motions. Defendants have challenged seven of Plaintiffs' causation experts and four of Plaintiffs' exposure experts.  Plaintiffs have challenged six of Defendants' causation experts and two of Defendants' exposure experts.

[5] This litigation began in 2009. In April 2013, because the parties had so many discovery disputes and the Court was concerned about these disputes potentially delaying depositions and jeopardizing the trial date, the Court issued an Order of Reference to Special Master Joseph R. Slights, III, Esquire, to assist in discovery matters and address designated evidentiary issues. The Special Master held over fifteen hearings and issued over twenty-five decisions. To date, the parties have spent in excess of $600,000.00 in Special Master fees, there are over 1000 docket

are the properties of Coal Ash Waste. Defendants seek to exclude Mr. William Konicki's expert opinion that the Coal Ash Waste dumped at Arroyo Barril contained fine particle content (silt) capable of becoming airborne and respirable.[6] Defendants dispute that the Coal Ash Waste became airborne, claiming it is a solid, rock-like substance, with a low potential for dust emissions.[7]

For the reasons set forth below, AES's *Daubert* Motion No. 10 to Exclude the Testimony of Mr. William Konicki is **DENIED.**

## II. BACKGROUND

Defendants operate power plants that burn coal for the purpose of generating energy.[8] Defendants' coal-fired power plants produce coal combustion by-products, specifically solid waste comprised of fly ash and bottom ash, also known as Coal Ash Waste.[9] Coal Ash Waste contains arsenic, cadmium, nickel,

---

entries, and the parties have filed at least seventy-eight motions since 2011.

[6] The parties submitted twenty-six Joint *Daubert* Exhibits, which include each expert's report, deposition, and curriculum vitae ("J. Ex.") (Trans. ID. 57342400). *See* J.Ex. 7A William P. Konicki, P.E. and Paul C. Scheiner, Ph.D., Evaluation of Manufactured Aggregate from AES Power Plant Guayama, Puerto Rico, placed in Arroyo Barril, Dominican Republic, Jan. 16, 2015.

[7] AES's Daubert Motion No. 10 to Exclude the Testimony of Mr. William Konicki at 1 ("Defs.' Mot. Exclude Konicki") (Trans. ID. 57346412).

[8] SAC ¶ 5.

[9] *Id.* Defendants admit that its coal-fired power plants generate "coal combustion products" but refer to the coal combustion products as "Manufactured Aggregate," rather than "Coal Ash Waste." Defendants' Answer and Affirmative Defense to Plaintiffs' Second Amended Complaint ¶¶ 5–6 ("Defs.' Ans. SAC") (Trans. ID. 44610320). According to Defendants, manufactured aggregate is "created by hardening a mixture of fly ash and bottom ash through a chemical hydration reaction and curing process [and] has a low potential for dust emissions." Defs.' Mot. Exclude Konicki at 1. The Court refers to the "coal combustion product" as "Coal Ash Waste," the term used in the Second Amended Complaint.

3

beryllium, chromium, lead, mercury, and vanadium.[10] Plaintiffs assert that it is "well known" that these substances cause birth defects and "other adverse reproductive outcomes, including cancer of the lung, kidney, bladder and skin, as well as respiratory illnesses and other disorders."[11]

Plaintiffs allege that, prior to October 2003, Defendants built a coal-fired power plant in Guayama, Puerto Rico ("AES Puerto Rico"), and Puerto Rican officials required Defendants to transport and dispose of the Coal Ash Waste generated at that plant outside of Puerto Rico.[12] As a result, from October 2003 until March 2004, Plaintiffs allege Defendants dumped thousands of tons of Coal Ash Waste on beaches in the Dominican Republic, including at the Arroyo Barril port located in the Samaná Province.[13] According to Plaintiffs, Coal Ash Waste containing hazardously high levels of toxins was deposited directly on a beach in Arroyo Barril located near Plaintiffs' homes, workplaces, and recreational sites.[14] Plaintiffs contend that the Coal Ash Waste was carried by wind and water to the local residential areas, and consequently, the Plaintiffs were exposed to dangerous

---

[10] SAC ¶ 6. Defendants admit that the "coal combustion products may contain trace amounts of arsenic, cadmium, nickel, beryllium, chromium, lead, mercury and vanadium." Defs.' Ans. SAC ¶ 6. However, Defendants allege that the concentrations are too low to be hazardous to human health. *Id.*
[11] SAC ¶ 16.
[12] *Id.* ¶ 7.
[13] *Id.* ¶¶ 10–11.
[14] *Id.*

levels of toxic materials contained in that Waste.[15]

As a result of this exposure, Plaintiffs allege the following injuries. Minor Plaintiff Maximiliano Calcaño was born on November 24, 2007, with multiple birth defects, including missing limbs.[16] Plaintiff Anajai Calcaño Pallano, individually, and as mother and natural guardian, brings suit on behalf of Maximiliano.[17]

Minor Plaintiff "Baby Mercedes" died shortly after birth on May 21, 2009, as a result of a failed "Siamese twinning."[18] Plaintiff Maribel Mercedes, individually, and as personal representative of the estate of Baby Mercedes, brings suit on behalf of Baby Mercedes.[19]

Minor Plaintiff Isael Altagracia Andujar was born on December 18, 2005, with "severe gastrointestinal anomalies, among other injuries."[20] Plaintiff Maribel Andujar Medina, individually, and as mother and natural guardian, brings suit on behalf of Isael.[21]

Minor "Baby Olmos," was born on July 23, 2008, "with severe gastrointestinal deformities and other birth defects, and died shortly thereafter."[22]

---

[15] *Id.* ¶¶ 57–58, 68.
[16] *Id.* ¶ 17.
[17] *Id.*
[18] *Id.* ¶ 18.
[19] *Id.*
[20] *Id.* ¶ 19.
[21] *Id.*
[22] *Id.* ¶ 20.

Plaintiff Rosa Maria Andujar, individually, and as personal representative of the estate of Baby Olmos, brings suit on behalf of Baby Olmos.[23]

Minor Plaintiff Estanlyn Garcia Deogracia was born on March 8, 2008, "with birth defects, including bony anomalies and an absent kidney."[24] Plaintiff Maria Virgen Deogracia, individually, and as mother and natural guardian, brings suit on behalf of Estanlyn.[25]

Plaintiff Amparo Andujar alleges that, after approximately four months of pregnancy in 2008, she had to undergo a therapeutic abortion because her physician believed that the "fetus exhibited several cranial and/or other anomalies and was no longer viable."[26]

## III. *DAUBERT* ANALYSIS

Delaware Rule of Evidence 702 governs the admission of expert testimony. D.R.E. Rule 702 provides:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

---

[23] *Id.*
[24] *Id.* ¶ 21.
[25] *Id.*
[26] *Id.* ¶ 22.

D.R.E. 702 is identical to its federal counterpart, Rule 702 of the Federal Rules of Evidence, which is governed by *Daubert v. Merrell Dow Pharmaceuticals, Inc.*[27] The Delaware Supreme Court has expressly adopted *Daubert* and its progeny.[28]

Under D.R.E. 702, the trial judge acts as gatekeeper to ensure that scientific testimony is both relevant and reliable.[29] "The foci of a *Daubert* analysis are the 'principles and methodology' used in formulating an expert's testimony, not [ ] the expert's resultant conclusions."[30] *Daubert* sets forth several non-exclusive factors to assist the trial judge in determining whether an expert's opinion is reliable, including testing, peer review, error rates, and acceptability in the relevant scientific community.[31]

Consistent with *Daubert*, in Delaware the trial judge must determine whether:

(1) the witness is qualified as an expert by knowledge, skill experience, training or education;

(2) the evidence is relevant;

---

[27] *Bowen v. E.I. DuPont de Nemours & Co.*, 906 A.2d 787, 794 (Del. 2006). *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

[28] *Tumlinson v. Advanced Micro Devices, Inc.*, 81 A.3d 1264, 1269 (Del. 2013) (internal quotations omitted).

[29] *Bowen*, 906 A.2d at 794 ("The trial judge acts as the 'gatekeeper' in deciding whether an expert's testimony 'has a reliable basis in the knowledge and experience of [the relevant] discipline.'").

[30] *Id.* (citing *Daubert*, 509 U.S. at 595).

[31] *Id.*

(3) the expert's opinion is based upon information reasonably relied upon by experts in the particular field;

(4) the expert testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and

(5) the expert testimony will not create unfair prejudice or confuse or mislead the jury."[32]

The party offering the testimony bears the burden of establishing its admissibility by a preponderance of the evidence.[33] Because trial judges perform an important gatekeeping function, the Delaware Supreme Court has afforded trial judges "considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."[34]

## IV. DISCUSSION

## A. Plaintiffs' Expert William P. Konicki, P.E., P.Eng.

William Konicki ("Konicki") is a licensed Civil Engineer with over forty years of experience in civil, structural, and foundation engineering.[35] Konicki

---

[32] *Id.* at 795.

[33] *Id.* at 794–95.

[34] *Id.* (internal quotations omitted).

[35] Plaintiffs' Response to AES's Daubert Motion to Exclude the Testimony of Mr. William Konicki at 1 ("Pls.' Resp.") (Trans. ID. 57496585); Pls.' Resp., Ex. A Konicki Affidavit ¶¶ 1–2 ("Konicki Aff."). Konicki has a Bachelor of Science and Master of Science in Civil Engineering, and is registered to practice in twenty-one states and one Canadian province. Konicki's numerous awards and honors include: Tau Beta Pi National Engineering Honor Society–RI Beta, American Consulting Engineers Council National Grand Award, New England ACEC Engineering Excellence Grand Conceptor Award, American Consulting Engineers Council National Honor Award, and Nelson C. White Creativity in Engineering Award. Konicki is a member of the American Concrete Institute, American Institute of Steel Construction, American Society of Civil Engineers, and Boston Society of Civil Engineers. *See* J.Ex. 7C Konicki Curriculum Vitae.

specializes in geotechnical engineering, which includes field and laboratory soil classification, selection of soil engineering properties, methods of field and laboratory testing to determine soil engineering properties, and applying soil engineering properties to the design of roadways, embankments, and foundations of structures.[36]

Konicki is currently the Senior Principal at an engineering consulting firm. In this position, he routinely analyzes the particle size and particle distribution of soils in both non-litigation and litigation work.[37]

## B. Konicki's Expert Opinion

Plaintiffs seek to prove through Konicki that the Coal Ash Waste dumped at Arroyo Barril contained fine particle content (silt) capable of becoming airborne and respirable.[38]  At Plaintiffs' request, Konicki evaluated the physical and chemical properties of the raw material used in the production of the Coal Ash Waste and the physical and engineering properties of the Waste,[39] and performed a particle size distribution analysis to determine how environmental conditions and

---

[36] Pls.' Resp. at 1; Konicki Aff. ¶ 2.

[37] Konicki Aff. ¶ 3; J.Ex. 7B Konicki Deposition at 14–18. Particle size distribution measures the amount of fine-size particles or silt in a material and the fine particle content measures the percentage of the material capable of being airborne and respirable. Pls.' Resp. at 10. Konicki has worked as project manager on over twenty-five projects relating to structural design of slurry walls, structural design of subway stations and tunnels, and structural foundation design of bridges.  Konicki's litigation work includes, but is not limited to, expert testimony relating to particle size analysis and distribution of fly ash as a structural fill and slope stability issues for a residential development. *See* J.Ex. 7B Konicki Deposition at 14–18; J.Ex. 7C Konicki Curriculum Vitae.

[38] Pls.' Resp. at 1.

[39] J.Ex. 7A at 1.

9

mechanical erosion affected the properties of the material.[40]

Konicki determined that the Defendants' Coal Ash Waste is not physically or chemically durable when exposed to routine environmental conditions (such as rain, sun, and wind), or when subjected to routine mechanical erosion (from storage, loading, transportation, and unloading).[41]  According to Konicki, the Coal Ash Waste has a variable composition, and gypsum, the primary bonding agent for the Waste, is partially soluble in fresh water and more soluble in seawater.[42] Konicki opines that the variable composition of the Coal Ash Waste and weakened gypsum bonds from weathering and mechanical erosion reduced and changed the particle size distribution of the Waste (increasing the silt content), and therefore, the Waste was, and is, capable of easily becoming airborne.[43]

Defendants seek to exclude this opinion, arguing that Konicki: (1) lacks the requisite qualifications;[44] and (2) relied on laboratory test results about the particle size distribution of Coal Ash Waste that employed the incorrect testing

---

[40] *Id.* Konicki relied on data about the raw materials used in the production of the Coal Ash Waste, the general processes used at Defendants' power plants, and information about the manner in which Coal Ash Waste was stored at AES Puerto Rico, transported to the Dominican Republic, and deposited on the beaches in Arroyo Barril.  Konicki Aff. ¶13.  Konicki also relied on governmental publications, industry publications, and peer-reviewed literature about the typical physical properties of fly ash, bottom ash, and chemical properties of gypsum. *Id.* ¶12.
[41] Pls.' Resp. at 2; J.Ex. 7A at i–iii.
[42] Konicki Aff. ¶ 6; J.Ex. 7A at ii–iii.
[43] Konicki Aff. ¶ 6; J.Ex. 7A at ii–iii.
[44] Defs.' Mot. Exclude Konicki at 8–12.

methodology.[45]

### 1. Konicki's Qualifications to Opine About the Particle Size Distribution of the Coal Ash Waste

Defendants claim Konicki lacks the requisite qualifications to offer an opinion on the chemical proprieties of the Coal Ash Waste.[46] Defendants argue that Konicki's opinion about the reduced particle size distribution is premised on physical chemistry and breakdown of chemical bonds, but Konicki is not a chemist, is not qualified to testify about chemistry, and is inappropriately serving as a "mouth piece" for his staff chemist.[47]

"A witness may testify as an expert when qualified as an expert and the trial judge determines that the witness has scientific, technical or other specialized knowledge that will assist the trier of fact in understanding evidence or in determining a fact at issue."[48] Under D.R.E. 702's liberal standard, an expert may be qualified as an expert through skill, experience, training, or education.[49]

The Court is not persuaded by Defendants' argument. It is well established that as long as a proper foundation is laid, an expert may base his or her opinion on

---

[45] *Id.* at 14–17.

[46] Defs.' Mot. Exclude Konicki at 8–12.

[47] *Id.*; AES's Reply Brief in Support of *Daubert* Motion No. 10 to Exclude the Testimony of Mr. William P. Konicki at 3 (Trans. ID. 57607865).

[48] *Eskin v. Carden*, 842 A.2d 1222, 1227 (Del. 2004).

[49] *Bell Sports, Inc. v. Yarusso*, 759 A.2d 582, 590 (Del. 2000) ("Since the adoption of the Delaware Rules of Evidence in 1980, this Court has recognized that opinion evidence may be offered if an expert's education, training or general experience demonstrates sufficient knowledge of general principles, even if the expert does not have particular experiences with the exact issue under examination.").

data or facts from another expert.[50] Konicki has over forty years of experience and expertise in civil, structural, and foundation engineering. Through this experience, Konicki has developed an understanding of chemistry as it relates to his expertise in civil engineering, and in this case, Konicki researched the typical chemical properties of fly ash, bottom ash, and the effect of water on the stability of gypsum.[51] In addition to relying on his own research, experience, expertise, education, and training, as a project manager, Konicki collaborated with his staff assistants to evaluate the issues related to chemistry, bonding, and weathering associated with Coal Ash Waste.[52] Konicki testified that it is a standard engineering practice for a senior engineer to oversee and interpret staff assistants' analyses and testing results to formulate an engineering opinion and conclusion.[53]

Based on Konicki's research, experience, expertise, education, and training

---

[50] D.R.E. 703 states: "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." *See also Laugelle v. Bell Helicopter Textron, Inc.*, 2014 WL 5038142, at *11 (Del. Super. 2014); *Dura Auto. Sys. of Indiana, Inc. v. CTS Corp.*, 285 F.3d 609, 612–13 (7th Cir. 2002). In *Dura Auto*, the Seventh Circuit explained that an expert "is permitted to use assistants in formulating his expert opinion, and normally they need not themselves testify [because] . . . [t]he opposing party can depose them in order to make sure they performed their tasks competently; and the expert witness can be asked at his deposition whether he supervised them carefully and whether his relying on their assistance was standard practice in his field." 285 F.3d 609, 612–13 (7th Cir. 2002). When the soundness of the underlying expert judgment is in issue, however, an expert cannot testify for the purpose of vouching for the truth of what the assistant told him. *Id.* at 613–14.
[51] Konicki Aff. ¶¶ 12, 24.
[52] *Id.* ¶¶ 3, 5–6.
[53] Pls.' Resp. at 2; Konicki Aff. ¶ 3.

as a civil engineer, the Court finds Konicki is qualified to opine about the reduced particle size distribution of Coal Ash Waste, and Konicki may rely upon and interpret his staff assistants' analyses and testing results to formulate his own expert opinion.

## 2. Konicki's Methodology

Konicki was unable to test the actual material dumped at Arroyo Barril.[54] However, Konicki considered two available particle size distribution test results of Coal Ash Waste from AES Puerto Rico—the 2004 Little Test[55] and the 2005 Rivera Test.[56] The Little Test indicates silt levels of 1.92%[57] and the Rivera Test indicates silt levels of 35.55% and 28.6%.[58] After thoroughly evaluating both, Konicki concluded that the Rivera Test is more reliable.[59]

Both the Rivera Test and Little Test utilized testing methods according to the standard procedures described by the American Society for Testing and

---

[54] Although there was a sample allegedly taken from Arroyo Barril, Konicki did not consider the sample because the mass of the sample was less than the minimum required by the ASTM and American Association of State Highway and Transportation Officials ("AASHTO") standards and because "it was highly suspect due to the lack of any chain of custody." Konicki Aff. ¶¶ 7–8. Konicki also explained that the sample had "already been previously handled, manipulated, and tested by others . . . making the sample non-representative of the material at Arroyo Barril." *Id.* ¶ 8.

[55] Pls.' Resp., Ex. E (Syam Kochyil & Dallas N. Little, Ph.D, P.E., Physical, Mechanical and Chemical Evaluation of Manufactured Aggregate, Sept. 14, 2004).

[56] Pls.' Resp., Ex. F (Victor E. Rivera Associates, Inc., Manufactured Aggregate Laboratory Test Results, Feb. 13, 2006.)

[57] Pls.' Resp., Ex. E at 3.

[58] Pls.' Resp., Ex. F at 2.

[59] Konicki Aff. ¶¶ 8–9, 20.

13

Materials (ASTM).[60]   The Rivera Test followed the Standard Test Method for Particle-Size Analysis of Soils (ASTM D422) and the Little Test employed the Standard Method of Test for Sieve Analysis of Fine and Coarse Aggregates (ASTM C136).[61]

Defendants contend Konicki's opinion that the Coal Ash Waste dumped at Arroyo Barril contained fine particle content or high silt content is not reliable because he did not test the actual material at Arroyo Barril, and the Rivera Test employed the incorrect methodology for testing the type of material at Arroyo Barril.[62]   According to Defendants, the Little Test properly utilized the ASTM C136 methodology, which is specified for determining the dusting potential of aggregate storage piles.[63]   In contrast, the Rivera Test employed the ASTM D422 methodology, which is used to analyze the particle size of a soil sample for purposes of determining its engineering properties, rather than assessing its dusting potential.

The Court is unpersuaded by this argument.  "*Daubert* neither requires nor empowers Trial Courts to determine which of several competing scientific theories has the best performance. *Daubert* demands only that the proponent of the

---

[60] *See* Defs.' Mot. Exclude Konicki, Ex. E ("Standard Method of Test for Sieve Analysis of Fine and Coarse Aggregates"), Ex. J ("Standard Test Method for Particle-Size Analysis of Soils").

[61] The ASTM 653 defines "aggregate" as "inert and durable granular mineral materials" and "soils" are defined as a mixture of different size particles that can range from gravel to sand to silt and to clay sizes." Konicki Aff. ¶ 31

[62] Defs.' Mot. Exclude Konicki at 14–17.

[63] *Id.*

evidence show that the expert's conclusion has been arrived at in a sound and methodologically reliable manner."[64]

Konicki explained that it is a standard and common practice in his professional practice as an engineer to make reasonable assumptions and draw conclusions relying on tests performed by other experts when the source material is inaccessible or has been removed or destroyed.[65] According to Konicki, he relied upon the Rivera Test instead of the Little Test because: (1) the material tested in the Little Test was not representative of the weathered and degraded material in Arroyo Barril; and (2) the Rivera Test testing methodology was more appropriate for determining the silt content of Coal Ash Waste at Arroyo Barril because it mimics the effects of weathering and mechanical degradation.[66]

Konicki determined the Coal Ash Waste was subject to weathering for at least two years while the stockpile was stored at the AES Puerto Rico, and was further exposed to weathering when transported and deposited at Arroyo Barril.[67] Konicki explained that because the sample used in the Little Test was about sixty days old, and was taken directly from the curing bed at the power plant, he

---

[64]*Minner v. Am. Mortgage & Guar. Co.*, 791 A.2d 826, 848 (Del. Super. 2000) (internal citations omitted).

[65] Konicki Aff. ¶ 7. *Tumlinson*, 81 A.3d at 1271–72 ("To be sure, every trial expert witness will necessarily form an opinion or draft a report for purposes of litigation. What is important, however, is whether the opinion or conclusion offered in litigation is consistent with, or based on, the expert's research and experience developed outside the litigation context.").

[66] Pls.' Resp. at 11–18.

[67] *See* J.Ex. 7A.

considered the sample to be a fresh and unweathered sample, and, therefore, non-representative of the material transported to Arroyo Barril.[68]

Konicki also explained that he relied on the Rivera Test because the ASTM D422 testing method closely mimics the effects of weathering and mechanical degradation on the measured particle size distribution.[69] Specifically, the ASTM D4222 method involves mechanically breaking up agglomerated particles in the sample with a mortar and pestle, and then wet sieving this crushed sample to determine particle size distribution.[70] In contrast, the ASTM C136 method, applicable only to coarse and fine aggregates, requires a dry sieving of the sample and does not mimic the effects of mechanical degradation or the effects of water on the measured particle size distribution.[71]

Accordingly, the Court finds that Konicki's proffered testimony is based upon sufficient facts and data, is the product of reliable principles and methods, and Konicki has applied those principles and methods reliably to the facts of this case.

## V. CONCLUSION

As discussed above, the Court finds Konicki is qualified by knowledge, skill experience, training, and education to opine about the particle size distribution of

---

[68] Konicki Aff. ¶¶ 20–23.
[69] *Id.* ¶¶ 30–35
[70] *Id.* ¶ 31.
[71] *Id.* ¶¶ 30–33.

the Coal Ash Waste; his opinion is relevant; his opinion is based upon information reasonably relied upon by experts in the particular field; his testimony will assist the trier of fact to understand the evidence or to determine a fact in issue; and the testimony will not create unfair prejudice or confuse or mislead the jury. For the foregoing reasons, Defendant's Motion to Exclude the Testimony of Mr. William P. Konicki is **DENIED.**

    **IT IS SO ORDERED.**


                         _____

                         Jan R. Jurden, President Judge