Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio


★ ★ ★ ★ ★ ★ ★



## OPINION

No. 04-09-00705-CV

**SOUTHLAND LLOYDS INSURANCE COMPANY**,
Appellant

v.

David Onofre **CANTU** and Guadalupe Cantu,
Appellees

From the 293rd Judicial District Court, Zavala County, Texas
Trial Court No. 05-11-11164-ZCV
Honorable Cynthia L. Muniz, Judge Presiding

Opinion by:     Sandee Bryan Marion, Justice

Sitting:     Catherine Stone, Chief Justice
             Sandee Bryan Marion, Justice
             Steven C. Hilbig, Justice

Delivered and Filed:  March 30, 2011

REVERSED AND RENDERED; REMANDED

## BACKGROUND

On April 4, 2004, David and Guadalupe Cantu's house was damaged in a hailstorm.  The Cantus' house was insured under a policy with Southland Lloyds Insurance Co.  Southland sent an independent adjustor, Bobby Arnold, to the Cantus' home to inspect the damage on April 13, 2004.  On April 27, 2004, Southland mailed to the Cantus a copy of Arnold's repair estimate and a letter advising them that a claim check in the amount of $2,036.85 would be sent to their

insurance agent within seven working days. On April 29, 2004, the check was sent to the Cantus' insurance agent at SAS-Lowery Insurance Agency. The Cantus cashed the check, but did not otherwise respond to Southland regarding the Arnold estimate. However, in June 2004, the Cantus notified Southland by letter that they had employed Joe Ortiz as a "building consultant" to investigate the extent of loss to their home. In the letter, the Cantus authorized Ortiz and/or Marcus Stites to act on their behalf. However, because Ortiz never returned Mr. Cantu's telephone calls, the Cantus later decided to hire an attorney. On July 10, 2004, Southland received an estimate prepared by Stites for Joatmon Loss Services in the amount of $6,855.66. Southland, unaware that the Cantus were dissatisfied with Ortiz and had hired an attorney, asked Arnold to contact Stites to determine why the estimate was so high. Southland never received a response from Joatmon or Stites. In June 2006, Bob Barton of Barton Claim Service inspected the Cantus' house at their request. He prepared a report that concluded most of the interior and exterior surfaces of the house had to be replaced for a total of $65,000.

The Cantus eventually sued Southland on claims for breach of contract and bad faith. Southland generally denied and also pled accord and satisfaction on the grounds that it had paid $2,036.85 in satisfaction of the "covered losses" under the policy. A jury found in favor of the Cantus. Southland now appeals.

### CANTUS' EXPERT

At trial, Bob Barton did not testify. Instead, Art Boutin, who adopted Barton's estimate, testified on the Cantus' behalf regarding the extent of damage to their house caused by the hailstorm. In its first issue, Southland raises several complaints regarding Boutin's testimony.

**1. Relevance and Reliability**

Under the policy, Southland's liability was limited to the lesser of the following: (1) the actual cash value at the time of loss determined with proper deduction for depreciation; (2) the cost to repair or replace the damaged property with material of like kind and quality, with proper deduction for depreciation; or (3) the specified limit of liability of the policy. According to Southland, Boutin's opinion that the hailstorm caused more than $65,000 in damage was not relevant because (1) he did not review the policy; (2) he did not intend to opine on whether the damage was covered by the terms of the policy; (3) he made no effort to determine whether any of the losses were "covered losses" under the policy; (4) his estimate was not economically feasible because the Cantus' house was valued at only $40,000;[1] and (5) he did not verify whether the items listed as damages in Barton's report were actually damaged. Thus, Southland concludes, Boutin's opinion is not relevant because he ignored what Southland characterizes as the "essential measure of damages in this case," which is "actual cash value [of the cost of repairs at the time of the loss] less depreciation." Southland also asserts Boutin's opinion is unreliable because it was speculative and there is too wide an analytical gap between his testimony and the Barton report on which he relied.

An expert's testimony is admissible under Texas Rule of Evidence 702 if the expert is qualified,[2] and the expert's opinion is relevant to the issues in the case and based upon a reliable foundation. TEX. R. EVID. 702; *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 720 (Tex. 1998); *E.I. du Pont de Nemours & Co. v. Robinson*, 923 S.W.2d 549, 556 (Tex. 1995). Rule 702's reliability requirement focuses on the principles, research, and methodology

---

[1] This "value" is taken from a section entitled "Coverages" contained in Southland's "Homeowners'/Fire Quick Quote By Fax."

[2] Southland does not challenge Boutin's qualifications.

underlying an expert's conclusions. *Exxon Pipeline Co. v. Zwahr*, 88 S.W.3d 623, 629 (Tex. 2002). Under this requirement, expert testimony is unreliable if it is not grounded in the methods and procedures of science and is no more than subjective belief or unsupported speculation. *Robinson*, 923 S.W.2d at 557. Expert testimony is also unreliable if there is too great an analytical gap between the data the expert relies upon and the opinion offered. *Gammill*, 972 S.W.2d at 727. In applying this reliability standard, however, the trial court does not decide whether the expert's conclusions are correct; rather, the trial court determines whether the analysis used to reach those conclusions is reliable. *Id.* at 728. Although the trial court serves as an evidentiary gatekeeper by screening out irrelevant and unreliable expert evidence, it has broad discretion to determine the admissibility of evidence. *Zwahr*, 88 S.W.3d at 629. Accordingly, we review the trial court's decision to admit Boutin's testimony for an abuse of discretion. *See Gammill*, 972 S.W.2d at 718-19; *Robinson*, 923 S.W.2d at 558.

Boutin, an independent insurance adjuster, testified he adopted Barton's report as his estimate of the cost to repair the damage to the Cantus' home that was caused by the hailstorm. He stated the manner in which the Barton report was prepared was no different from any estimate he would have prepared for an insurance company. Boutin said that if he had been asked by the Cantus to prepare the report, his investigation would have been the same as Barton's. Boutin explained that the software used to prepare the Barton report is called Exactimate and is accepted by most insurance companies. Exactimate has a large database for materials and labor for specific geographic areas, and he has used Exactimate for seven years. Boutin spoke with Mr. Cantu, who provided him with an overview of the damage sustained during the storm. Boutin spent approximately ninety minutes at the house, and with the Barton report in hand, he went inside the house, room-by-room, to take measurements. He also took

measurements outside, including on the roof. He said he independently verified the damage to the house as represented in the Barton report. He saw no damage to the house other than the damage caused by the hailstorm. He was aware the Cantus had already made some exterior repairs to the house, but he did not know if any interior repairs had been made.

Barton prepared his report in June 2006, and Boutin went to the Cantu home for the first time in January 2009. Boutin said his ability to adopt Barton's estimate or his ability to prepare his own report would not have been affected by his not going to the house until 2009. When asked why, he responded that "In the past I've been asked to adopt other estimates with insurance companies doing inspection[s], and it's much the same process. You go out and do the measurements and it was virtually the same process." When asked to explain a repair estimate of $65,000 on a home insured for only $42,000, Boutin stated that the amount of work that must be done to repair damage to the house has nothing to do with the amount for which the house is insured. Boutin said one of the reasons this happens is because the cost of any required demolition work, such as removal of debris, may account for up to fifty percent of the value of the repair work. The Barton report calls for replacing the fascia boards, siding, and insulation on the outside of the house, as well as replacing everything related to the roof. Although Mr. Cantu said that hail damaged only two sides of the house, Boutin agreed with Barton that all four sides should be replaced because "it's an industry standard that if 50 percent or more is damaged, you replace all of the siding" to ensure the siding matched on all four sides of the house, and he followed this rule when he worked for insurance companies. He said the same rule applied to roof damage. When asked why he would estimate repair work to the outside of the house even though Mr. Cantu had already done some of the exterior repairs, Boutin replied that an estimate is based on an assumption that no repair work has been done.

As to the interior of the house, the report calls for extensive repair work in almost every room throughout the house—such as replacing ceiling insulation, removing kitchen cabinets, replacing dry wall, and replacing and removing electric outlets—because all those areas were damaged by the storm. When asked how he knew these areas had been damaged by the storm, Boutin replied, "It's consistent with damage that I've seen in the past." He said he saw the interior damage when he inspected the Cantus' house. He also said the fifty percent rule did not necessarily apply to interior work. When asked why all the interior work was needed, Boutin stated, "Because when the ceilings are damaged, to take the ceiling down, you are going to damage the walls as you remove them." From his inspection, he knew there would be ceiling damage from roof leaks. As to why all the kitchen cabinets had to be replaced when there was no evidence water had gotten into the cabinets, Boutin explained that in the process of removing the cabinets to replace drywall, they could be damaged.

Boutin said he had no problem with the insurance company applying a fifty percent depreciation on the material to replace the Cantus' roof because fifty percent is an industry standard. He explained that the amount of depreciation on a roof is more than on materials for other parts of the house, such as siding, because a roof does not last as long. However, he believed the amount Southland paid to the Cantus would replace only part of the roof. Although the Arnold estimate prepared for Southland applied depreciation to both labor and materials, Boutin said that in the thousands of times he has applied depreciation, he has never taken depreciation on labor because labor is not a "material" that loses value over time.

On cross-examination, Boutin admitted he had not seen the Southland insurance policy issued to the Cantus. However, Boutin said he did not intend to opine on whether the damages were covered by the terms of the policy; instead, he intended to opine about the cost to repair the

damage caused by the hailstorm. As to Barton's report, Boutin said he never spoke to Barton about the report. Boutin acknowledged that the storm damage occurred in 2004, but Barton's report was not prepared until 2006. Boutin was not aware of anyone adjusting the Exactimate 2006 cost estimate to reflect 2004 numbers. However, he did not believe there was a significant difference in cost between 2004 and 2006. The estimate called for the existing roof to be replaced with a twenty-five-year composition shingle roof, but Boutin did not know whether the original roof had twenty-year or twenty-five-year shingles. He conceded that replacing a twenty-year shingle roof with a twenty-five-year shingle roof would place the owner in a better position than he was in before the storm. He did not know what portion of the roof or roof decking needed to be replaced. He did not know the pre-storm quality of the fascia and whether it was the same as the quality of fascia called for in the report. He did not know the size of the air conditioner before the storm, although the Barton report included a large unit. The report called for insulation in the walls, although Boutin did not know if the walls were insulated prior to the storm. And if there was pre-existing insulation, he did not know whether it had gotten wet and, therefore, needed to be replaced. However, he said he did not need to check the insulation because he knew the dry wall and almost the entire ceiling throughout the house were wet and, therefore, the insulation was wet. On redirect, Boutin stated he saw water damage from the hailstorm to the ceiling, walls, and floor of the house.

Boutin was called as an expert to opine only on the estimated cost to repair any damage to the Cantus' home caused by the hailstorm. For that purpose, we conclude he was required only to determine what damage was attributable to hail and it was not necessary for him to (1) review the policy; (2) opine on whether the damage was covered by the terms of the policy; or (3) determine whether any of the losses were "covered losses" under the policy. We disagree

with Southland's argument that his estimate was not economically feasible because the Cantus' house was valued at only $40,000, because Boutin adequately explained that the amount of work that must be done to repair a house has nothing to do with the amount of insurance available to pay for those repairs. Finally, we conclude Southland's argument that Boutin did not verify whether the items listed as damages in Barton's report were actually damaged goes to the weight of the evidence and not its relevance or reliability.

### 2.      "Parroting" the Opinion of Another Expert

As an expert, Boutin was permitted to testify as to relevant matters about which he had personal knowledge, TEX. R. EVID. 402, 602, 703, and to state his opinion based upon his personal knowledge of the facts and the evidence, TEX. R. EVID. 703. Boutin was also authorized to rely on facts or data contained in the Barton report in forming his own opinion as to the evidence examined, regardless of the admissibility of such facts or data.

On appeal, Southland argues Boutin's testimony lacked relevance and reliability because he merely adopted Bob Barton's report. Southland argues that federal rules of evidence similar to Texas Rule of Evidence 703 "do not extend so far as to allow experts to simply parrot or recite the opinions of other experts, as Boutin did here." Southland relies on several federal cases for the proposition that "experts are permitted to rely on opinions of other experts to the extent that they are of the type that would be reasonably relied upon by other experts in the field." *See Malletier v. Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 664 (S.D.N.Y. 2007). "But in doing so, the expert witness must in the end be giving his *own* opinion. He cannot simply be a conduit for the opinion of an unproduced expert." *Id.*

In *Malletier*, an expert, Weston Anson, based his conclusion on a regression analysis conducted on Louis Vuitton sales data. *Id.* But Anson did not conduct the regression analysis

himself; instead, it was conducted by Anson's company's senior analyst, Fernando Torres, who was not produced at trial. The court held that "[w]hile Mr. Torres was probably qualified to conduct a regression analysis . . . *Anson was not presented as and was demonstrably unqualified to be an expert on statistical analysis*." *Id.* (emphasis added). At his deposition, Anson testified that "in simplistic terms" he knew how to conduct a regression analysis. "But that asserted ability was based on studying statistics in graduate school 30 years earlier, and no good faith argument can be made that 30 year-old course study is a sufficient qualification to testify as a statistician." *Id.* Anson admitted he "essentially had nothing to do with the preparation of the regression analysis" and instead, it was his practice to "turn this over to an economist." *Id.* The court concluded "Anson's occasional use of statistics in his daily life simply does not qualify him as an expert on that complex subject." *Id.* Therefore, "[b]ecause Anson is not qualified to conduct or interpret statistical analyses, the regression analysis could only be admissible if Anson is permitted to give an opinion by relying completely on Torres's opinion." *Id.* The court held that a "'scientist, however well credentialed he may be, is not permitted to be the mouthpiece of a scientist in a different specialty.'" *Id.* at 665 (quoting *Dura Auto. Sys. v. CTS Corp.*, 285 F.3d 609, 614 (7th Cir. 2002)). "In the words of the *Dura* court, Torres exercised 'independent judgment' that was 'beyond [Anson's] ken.'" *Id.* at 665-66 (quoting *Dura*, 285 F.3d at 613).[3] "With respect to the regression analysis, Anson was not an expert but rather a

---

[3] The *Dura* court determined that the assistants of the challenged expert "did not merely collect data for him to massage or apply concededly appropriate techniques in a concededly appropriate manner, or otherwise perform routine procedures, and *that he himself lacks the necessary expertise to determine whether the techniques were appropriately chosen and applied*." 285 F.3d at 615 (emphasis added). In this case there were two "crucial issues": "the map of the capture zone and whether, if CTS's plant was within it, how much if any of the contamination of the well field was due to the groundwater running beneath that plant." *Id.* The court concluded the expert "was not competent to opine on the first issue, and without an expert opinion on that issue Dura could not get to the second and so could not prevail." *Id.*

'mouthpiece.' Louis Vuitton thus produced the wrong expert to prove the reliability of the regression analysis." *Id.* at 666.

Southland also relies on *Matter of James Wilson Associates*, 965 F.2d 160 (7th Cir. 1992), in which evidence of a building's state of repair was obtained by a consulting engineer retained by the insurer's expert witness, an architect who planned to testify about the physical condition of the building as reported to him by the consulting engineer. The court first noted that an expert is "permitted to testify to an opinion formed on the basis of information that is handed to rather than developed by him—information of which he lacks first-hand knowledge and which might not be admissible in evidence no matter by whom presented." *Id.* at 172. "But the judge must make sure that the expert isn't being used as a vehicle for circumventing the rules of evidence." *Id.* at 173. "The fact that inadmissible evidence is the (permissible) premise of the expert's opinion does not make that evidence admissible for other purposes, purposes independent of the opinion." *Id.* The court stated as follows:

> If for example the expert witness (call him A) bases his opinion in part on a fact (call it X) that the party's lawyer told him, the lawyer cannot in closing argument tell the jury, "See, we proved X through our expert witness, A." That was the kind of hand-off attempted in this case. The issue was the state of the building, and the expert who had evaluated that state-the consulting engineer-was the one who should have testified. *The architect could use what the engineer told him to offer an opinion within the architect's domain of expertise*, but he could not testify for the purpose of vouching for the truth of what the engineer had told him—of becoming in short the engineer's spokesman. Why [the insurer] did not call the engineer as a witness is unexplained, but it is improper to use an expert witness as a screen against cross-examination (though the other side could always call him as an adverse witness, and cross-examine him).

*Id.* at 173 (emphasis added).

Finally, in *In re Sulfuric Acid Antitrust Litigation*, the court stated "Analysis becomes more complicated if the assistants exercise professional judgment that is beyond the expert's ken." 446 F. Supp. 2d 910, 916 (N.D. Ill. 2006). "In that context, it must be determined whether

the disclosed expert is genuinely formulating an opinion based in part on the underlying data or whether he is acting as the 'mouthpiece' for the non-testifying individual on whose data he is relying." *Id.* "If the latter, the hearsay rule prohibits the testimony unless the non-testifying individual also testifies." *Id.*

We do not believe Boutin was merely "parroting" the Barton opinion. Barton's professional judgment was within Boutin's knowledge—they are both experienced insurance adjusters and Boutin is familiar with and has used the Exactimate software used by Barton to prepare his report. Boutin's qualifications as an insurance adjuster are undisputed. He stated the manner in which the Barton estimate was prepared was no different from any estimate he would have prepared for an insurance company. Boutin has adjusted approximately forty claims with Barton, and he said that if he had been asked by the Cantus to prepare the report, his investigation would have been the same as Barton's. Boutin spoke with Mr. Cantu, who provided him with an overview of the damages sustained during the storm, and he independently inspected and verified the damage to the house as represented in the Barton report. He saw no damage to the house other than the hail damage. Based on this record, we conclude Boutin was "genuinely formulating an opinion based in part on the underlying data" supplied by Barton.

## BAD FAITH CLAIM

In answer to question number four, the jury found Southland engaged in unfair or deceptive acts or practices by (1) refusing to pay a claim without conducting a reasonable investigation of the claim based on all available information; (2) failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability has become reasonably clear; and (3) compelling the Cantus to institute a lawsuit to recover amounts due under their policy by offering substantially less than the amounts ultimately recovered. In

answer to question number seven, the jury found that Southland engaged in such conduct "knowingly." In its second and fourth issues, Southland asserts the evidence is legally and factually insufficient to support these bad faith findings or that it acted with "actual awareness of the falsity, deception, or unfairness of the conduct in question."

A breach of the duty of good faith and fair dealing may give rise to a cause of action in tort that is separate from any cause of action for breach of the underlying insurance contract. *Transp. Ins. Co. v. Moriel*, 879 S.W.2d 10, 17 (Tex. 1994). "The contract aspect of a coverage dispute concerns either the factual basis for the claim, the proper legal interpretation of the policy, or both." *Id.* If the loss is covered, the insurer must pay the claim pursuant to the terms of the insurance contract. *Id.* An insurer's failure to pay a covered claim is ordinarily a breach of contract that does not alone entitle a plaintiff to mental anguish or exemplary damages. *Id.*

"The threshold of bad faith is reached when a breach of contract is accompanied by an independent tort." *Id.* In *Arnold v. National County Mutual Fire Ins.*, the Texas Supreme Court addressed whether insurers have a common law duty to deal fairly and in good faith with their insureds. 725 S.W.2d 165, 167 (Tex. 1987). Holding that such a duty does exist, the *Arnold* Court held that a "cause of action for breach of the duty of good faith and fair dealing is stated when it is alleged that there is no reasonable basis for denial of a claim or delay in payment or a failure on the part of the insurer to determine whether there is any reasonable basis for the denial or delay." *Id.*

Almost ten years later, the Texas Supreme Court clarified the standard for imposing liability for breach of the duty of good faith and fair dealing in *Universe Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 (Tex. 1997) (stating that "'no reasonable basis' element of tort has injected needless complexity into no-evidence review of bad faith claims"). Noting that the Texas

Insurance Code defined unfair insurance settlement practices to include "'failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim with respect to which the insurer's liability has become reasonably clear . . . ,'" the Court concluded this standard would "prove workable in" common law bad faith claims. *Id.* at 55-56 (quoting predecessor to TEX. INS. CODE ANN. § 541.060(a)(2)(A) (West 2009)). According to the *Giles* Court, the "'reasonably clear' standard recasts the liability standard in positive terms, rather than the current negative formulation. Under this standard, an insurer will be liable if the insurer knew or should have known that it was reasonably clear that the claim was covered." *Id.* at 56. The *Giles* Court also noted that an insurer cannot escape liability merely by failing to investigate a claim so that it can contend liability was never reasonably clear. *Id.* at n.5. Instead, the Court reaffirmed that an insurance company may also breach its duty of good faith and fair dealing by failing to reasonably investigate a claim. *Id.* Whether an insurer acted in bad faith because it failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim after its liability became reasonably clear is a question for the factfinder. *Id.* at 56.

In this case, the trial court submitted the case under the "reasonably clear" standard by asking whether Southland engaged in unfair or deceptive acts or practices by failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of a claim when the insurer's liability had become reasonably clear. The trial court also submitted the case under the standard set forth in the Insurance Code by asking whether Southland (1) refused to pay a claim without conducting a reasonable investigation of the claim based on all available information, or (2) compelled the Cantus to institute a lawsuit to recover amounts due under their policy by offering substantially less than the amounts ultimately recovered. TEX. INS. CODE ANN.

§§ 541.060(a)(7), 542.003(b)(5) (West 2009). The jury answered affirmatively to each question; therefore, we consider the sufficiency of the evidence in support of each finding.

In reviewing the evidence, we must distinguish between the evidence supporting the contract issue and the tort issue. The issue of bad faith does not focus on whether the claim was valid. *Lyons v. Millers Cas. Ins. Co.*, 866 S.W.2d 597, 601 (Tex. 1993). "The evidence must relate to the tort issue of [whether the insurer's liability had become reasonably clear], not just to the contract issue of coverage." *Id.* at 600. "This focus on the evidence and its relation to the elements of bad faith is necessary to maintain the distinction between a contract claim on the policy, and a claim of bad faith delay or denial of that claim, which arises from the tort duty . . . imposed on insurers . . . ." *Id.* Courts and juries do not weigh the conflicting evidence that was before the insurer; rather, they decide whether evidence existed to justify denial of the claim. *State Farm Lloyds, Inc. v. Polasek*, 847 S.W.2d 279, 285 (Tex. App.—San Antonio 1992, writ denied). In other words, the issue under a no-evidence review is whether there is "some evidence" that the insurer's liability had become reasonably clear. *See id.* at 284-85.

Evidence that shows only a bona fide coverage dispute does not, standing alone, demonstrate bad faith. *State Farm Lloyds v. Nicolau*, 951 S.W.2d 444, 448 (Tex. 1997); *Moriel*, 879 S.W.2d at 17. "Nor is bad faith established if the evidence shows the insurer was merely incorrect about the factual basis for its denial of the claim, or about the proper construction of the policy." *Moriel*, 879 S.W.2d at 18. "A simple disagreement among experts about whether the cause of the loss is one covered by the policy will not support a judgment for bad faith." *Id.* On the other hand, the mere fact that an insurer relies upon an expert's report to deny a claim does not automatically foreclose bad faith recovery as a matter of law. *Nicolau*, 951 S.W.2d at 448. Instead, an insurer's reliance on an expert's report, standing alone, will not necessarily shield the

carrier if there is evidence that the report was not objectively prepared or the insurer's reliance on the report was unreasonable. *Id.* Evidence casting doubt on the reliability of the insurer's expert's opinions may support a bad faith finding. *Id.* Whether the insurer's liability had become reasonably clear, however, must be judged by the facts before the insurer at the time the claim was denied. *Viles v. Sec. Nat'l Ins. Co.*, 788 S.W.2d 566, 567 (Tex. 1990).

The Cantus did not argue at trial that Southland hired Arnold because of any lack of objectivity on his part; however, on appeal, the Cantus assert Southland sent Arnold to perform an outcome-oriented investigation. But to show bad faith, the Cantus were required to produce evidence showing "behavior more egregious than merely hiring a firm whose reports generally feature an outcome favored by its recipient." *See Travelers Pers. Sec. Ins. v. McClelland*, 189 S.W.3d 846, 854 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Nicolau*, 951 S.W.2d at 449 ("All experts presumably have certain general views and expertise, and an insurer's mere awareness of such views is not necessarily an indication of bad faith.").

The only evidence in the record as to why Southland retained Arnold comes from the testimony of Roy Hignight, the Southland employee who handled the Cantus' claim and who hired Arnold. Hignight stated that Arnold had adjusted claims for Southland for about ten years, and he knew Arnold to be an experienced independent insurance adjuster. Thus, nothing in the record indicates Southland hired Arnold based on any view he personally held. *See Nicolau*, 951 S.W.2d at 448 (concluding evidence supported logical inference that State Farm obtained reports from Haag Engineering because of Haag's general view that plumbing leaks (a covered loss) are unlikely to cause foundation damage). Mr. Cantu testified Arnold spent only about forty-five minutes at the house and the jury heard Arnold's own testimony that he inspected twelve to thirteen houses on one day for Southland. Arnold testified that over the past ten years he had

worked for more than two dozen different insurance companies. However, the record contains no evidence as to Arnold's general view of claims work for either Southland specifically or other insurance companies generally. *See State Farm Lloyds v. Hamilton*, 265 S.W.3d 725, 735 (Tex. App.—Dallas 2008, pet. dism'd) (record contained evidence that insurer's expert never testified against insurer's interest and derived a large part of his business from insurer). Because the Cantus produced no evidence that would support an inference that Arnold's report was not objectively prepared, we next consider whether Southland's reliance on Arnold's report was reasonable.

The Cantus contend the reasonableness of Southland's decision to pay what it did is called into question by (1) its reliance on Arnold's "slip-shot" inspection and "low-ball" estimate, and (2) the fact that, when faced with evidence "purportedly" from the Cantus that the estimate it paid was not sufficient and that Southland had missed significant elements of the covered damages in its own estimates, Southland did nothing. The Cantus' argument focuses on the depth of the investigation into the damage that resulted from the hailstorm. The Cantus contend Arnold spent only about forty-five minutes at the house, he did not document in his report all the damage they allege was caused by the storm, and he took an inappropriate amount of depreciation. Although Arnold disputed Mr. Cantu's estimate of the length of time he spent at the house, it was for the jury to decide whose testimony to accept on this question. There is no dispute that Arnold did not photograph all the damage in the house. However, Arnold testified he documents only damage that results from a covered loss, and Hignight agreed it would not be possible for adjusters to document every single damaged item in a structure without regard to whether the damage resulted from a covered loss. For example, Arnold photographed one stain on the ceiling but not a second stain because the Cantus told him the second stain pre-existed the

hailstorm. The Cantus denied this, and testified both ceiling stains appeared after the storm. The Cantus rely on Barton's report to allege there was water and hail damage throughout the house to a greater extent than that documented in Arnold's report. Again, the jury was free to credit the Cantus' testimony and Barton's report over that of Arnold. However, to establish bad faith, rather than a mere breach of contract, the Cantus were required to show more than a "simple disagreement among experts about whether the cause of loss is one covered by the policy . . . ." *Moriel*, 879 S.W.2d at 18. A conflict between the carrier's expert and other experts may or may not, standing alone, be sufficient to allow a "bad faith" claim to go to a jury. *Guajardo v. Liberty Mut. Ins. Co.*, 831 S.W.2d 358, 365 (Tex. App.—Corpus Christi 1992, writ denied). "In addition to the conflicting expert opinion, the party alleging bad faith must also bring direct or circumstantial evidence showing that the carrier's expert's opinion was questionable and that the carrier knew or should have known that the opinion was questionable." *Id.*

The depth of Arnold's investigation was the same as Barton's in that both inspected the inside and outside of the house and took various measurements. Mr. Cantu conceded he had conversations with both men about the extent of the damage. Southland received two estimates before the lawsuit was filed: one from Arnold in the amount of $4,390.50 that included damage to both the inside and outside of the house, and one from Stites in the amount of $6,855.66 that included damage only to the outside of the house. Southland received the third estimate from Barton after the lawsuit was filed in the amount of $65,000 that included damage to both the inside and outside of the house, but no depreciation. Regardless of the reasons for the disagreement amongst the three adjusters, the fact remains that they disagreed and provided Southland with three widely varying estimates. That Arnold's estimate was lower than Stites' estimate, which, in turn, was lower than Barton's estimate "only establishes the estimates

differed." *Johnson v. Essex Ins. Co.*, No. 04-00-00745-CV, 2002 WL 112561, at \*8 (Tex. App.—San Antonio Jan. 30, 2002, no pet.) (mem. op.). "Similarly, evidence that the scope of repairs in [Arnold's] report 'does not come close to matching' [Barton's] report is not evidence of unreasonableness." *Id.* Therefore, we also look to Southland's actions with regard to the differing reports and whether Stites's pre-lawsuit estimate of damage cast doubt on the reliability of Arnold's estimate of damage.

Roy Hignight first received the claim on April 5, 2004, the day after the storm. The next day, Hignight informed the Cantus by letter that Southland had received their claim and an adjuster would contact them. The letter provided the Cantus with Robert Arnold's name and telephone number. Although Mr. Cantu testified he did not remember receiving the letter, Hignight testified the letter was mailed to the Cantus and was never returned to Southland as not delivered. Arnold arrived at the house about seven days after the storm. Arnold's estimate for total loss amounted to $4,390.50, less depreciation of $1,933.65 and the deductible of $420, for a net claim amount of $2,036.85.

Hignight testified that when he reviewed Arnold's report, he saw nothing wrong with it, except he did not believe the spot on the ceiling needed to be repaired. However, because Arnold's estimate allowed for the cost of repair, Hignight did not contest the repair estimate, and he paid the claim in the amount recommended by Arnold. By letter dated April 27, 2004, Hignight enclosed a copy of Arnold's estimate and informed the Cantus that a claim check in the amount of $2,036.85 would be mailed to their agent within seven working days. Hignight said that the check was cashed and he never heard from the Cantus or SAS-Lowery until he received

a June 17, 2004 letter purportedly[4] signed by the Cantus. In this letter, the Cantus expressly authorized Ortiz and/or Stites to act on their behalf with respect to the claim and appointed Ortiz and/or Stites as their agent to meet with Southland, its employees, and adjustors "to discuss this loss and work toward a mutually satisfactory settlement of this claim." The Cantus reserved to themselves the right to enter into a final settlement of the claim, but asked that Joe A. Ortiz, Building Consultant, be named as a co-payee on any drafts or checks. The letter ended by stating that "[i]n the unlikely event that the services of an attorney become necessary, [the Cantus ] will provide you with the name of [their] attorney." Hignight believed the letter meant the Cantus wanted him to work directly with Ortiz or Stites as their agent. When Hignight received the letter, he forwarded a copy to Arnold. On July 9, 2004, Hignight received a copy of a June 16, 2004 estimate prepared by Stites for Joatmon Loss Services, Inc., which estimated the cost of repairs at $6,855.66. Hignight sent Arnold a copy of the estimate and asked Arnold to contact Stites and ask for an explanation as to why the unit costs were so high and to see if they could work things out. The next day, Arnold faxed a copy of the Stites estimate to both Hignight and Stites with Arnold's handwritten notes on various line items in the estimate. Arnold also faxed a copy of his own estimate to Stites. On the fax coversheet to Hignight, Arnold characterized the Stites estimate as "excessive" and he stated he was awaiting Stites' response. On the fax coversheet to Stites, Arnold wrote as follows:

> We have recvd & revwd your repair bid for the above referenced insured. (your estimate attached) We found your estimate to be very high, much above industry standard for unit costs. We are faxing you our repair estimate to review and go by.
> Please call me or fax me your reply.

---

[4] Mr. Cantu testified he and his wife hired Ortiz after a community meeting, but he claimed he and his wife only signed a blank sheet of paper. The letter has the Cantus' names and address in the letterhead and is addressed to SAS-Lowery Insurance Agency, which forwarded the letter to Hignight.

Southland was not aware of the Cantus' dissatisfaction with Ortiz and neither Arnold nor Hignight received a response from Stites, Ortiz, or anyone at Joatmon.

The Stites estimate, which did not account for depreciation or the Cantus' deductible, called for replacing the roof, painting the exterior fascia, and final cleanup for a total of $6,855.66, compared to Arnold's pre-depreciation/deductible estimate of $4,390.50. Hignight explained his interpretation of the Stites estimate as follows:

> It showed me that it was the same scope as Bobby Arnold's estimate.
>
> . . .
>
> Well, the areas that Marcus Stites allowed for was [sic] the same areas Bobby Arnold allowed for, with the exception that Bobby Arnold allowed for interior damage and repairs to the air conditioning and windows and which Marcus Stites did not allow that.
>
> . . .
>
> I interpreted [Stites' not allowing for interior damage] as that Mr. Stites did not have any issues with the interior allowance made by Mr. Arnold; that his concern was on the — on the roof and other exterior items that Bobby Arnold allowed for.

When asked why Stites's estimate was almost $2,000 more than the Arnold estimate, Hignight responded that some of the items on Stites's report appeared "to be extremely high."

The next and last time Hignight heard anything about the Cantus' claim was December 20, 2004 when Arnold faxed to him a letter signed by the Cantus and mailed to Arnold. In the letter, which was dated October 12, 2004 but not received by Arnold until December 20, 2004, the Cantus "invoke[d] the appraisal process" because they believed "the funds that Colonial Lloyds Insurance Company estimated to repair [their] house are not sufficient." Hignight testified that Southland and Colonial Lloyds Insurance Company are not the same company. Hignight also said that language in the letter that referenced the appraisal process was not

language contained in the policy Southland issued to the Cantus. Hignight thought the Cantus were referencing an entirely different policy on other property they owned. However, Hignight conceded that the policy number referenced in the letter was the Cantus' Southland policy and the claim number referenced the hailstorm claim. He admitted that despite his confusion he did not attempt to contact the Cantus or anyone working on their behalf.

Hignight said that until the Cantus sued in November 2005, he knew only of the Stites estimate, which was a couple of thousand dollars more than the Arnold estimate. In mid-November 2005, Hignight received the Cantus' petition in which they alleged they "sustained covered losses in the form of accidental plumbing or air condition leaks and discharges, water damage, and damage resulting therefrom including damage to the architectural finishes of the home . . . ." The petition did not specifically mention the April 2004 hailstorm, nor did the petition complain specifically about the manner in which Southland handled the hailstorm claim. Upon receiving the petition, Hignight contacted the Cantus' insurance agent at SAS-Lowery, Olga Lopez, because Southland had never heard of a problem with the accidental discharge of water, and Lopez informed him SAS-Lowery had received a hand-written letter dated October 3, 2005 from the Cantus asserting additional water damage.[5] Hignight asked Lopez why the October 3 letter had not been immediately sent to Southland, and Lopez said she did not know what the letter was in reference to. Hignight said he finally realized the lawsuit was filed in connection with the hailstorm when he received a copy of the Barton estimate in October 2006, almost one year after the lawsuit was filed. Hignight characterized the Barton estimate as "excessive" because "[v]irtually every surface area on the house is damaged to include decking, flooring, interior walls, kitchen cabinetry, bathrooms, bedrooms, exterior siding, everything on the house is claimed to be damaged in this scope."

---

[5] Mr. Cantu testified the letter was hand-written for him at his attorney's office.

Southland paid considerably less than what the Cantus believed their losses to be; however, the evidence shows the Cantus cashed Southland's check without complaint. Two months later, Southland received a letter in which the Cantus authorized Ortiz and/or Stites to act on their behalf, and appointed Ortiz and/or Stites to meet with Southland's adjusters and employees to discuss the loss "and work toward a mutually satisfactory settlement of" their claim. Although Mr. Cantu testified he later became dissatisfied with Ortiz, he never communicated this dissatisfaction to either Southland or Arnold. Therefore, acting in accordance with the terms of the letter, Southland attempted to communicate only with Stites. When Southland received Stites's estimate and attempted to contact Stites regarding his estimate, Southland never received a response.

The fact of liability for damage caused by the hailstorm was clear, and Southland promptly issued a check to cover repairs for storm damage as determined by its adjuster. Pursuant to the terms of the insurance contract, Southland was not liable for normal wear and tear. The question, thus, became a coverage dispute: whether all of the damage alleged by the Cantus was the result of the hailstorm, and if caused by the storm, the extent of repair versus replacement necessary to put the Cantus back into the position they were in before the storm. Liability as to this question was not reasonably clear at the time Southland paid the claim and was ultimately decided by the jury in this case. Therefore, we conclude there is no evidence that Southland's reliance on Arnold's report was unreasonable, nor is there any other evidence from which a factfinder could infer that Southland failed to attempt in good faith to effectuate a prompt, fair, and equitable settlement when its liability had become reasonably clear or that Southland failed to conduct a reasonable investigation based on all available information. For these same reasons, we also conclude there is no evidence the Cantus were compelled to institute

a lawsuit to recover amounts due under their policy because Southland offered substantially less than the amounts ultimately recovered. Accordingly, we conclude the evidence is legally insufficient to support a finding on bad faith.[6]

## BREACH OF CONTRACT

The jury awarded the Cantus $30,000 as compensation for Southland's failure to pay for covered physical loss to their home. In its third issue, Southland contends the Cantus are not entitled to recover on their breach of contract claim because they failed to segregate what was a "covered loss" under the policy from what was not a "covered loss" in Barton's report.

The premise of Southland's argument, with which we agree, is that an insured is entitled to recover only that portion of the damage caused solely by a covered peril. *See Wallis v. United Servs. Auto. Assoc.*, 2 S.W.3d 300, 302-03 (Tex. App.—San Antonio 1999, pet. denied). However, *Wallis* and the other opinions upon which Southland relies all involved cases in which the jury was asked to allocate damage attributable to a peril specifically covered under the insurance policy versus damage attributable to a peril specifically excluded under the policy. For example, in *Wallis*, USAA determined the foundation damage to the insureds' house was caused by a combination of several excluded perils, including settlement, poor surface drainage, the topography of the lot, and surrounding vegetation. *Id.* at 301-02. Plumbing leaks, which were covered perils under the policy, were also detected; however, based on soil testing and continued earth settlement following repair of the insureds' plumbing system, USAA concluded the leaks were negligible and had not caused or contributed to the complained-of damage. USAA believed improper compaction of the fill dirt upon which the insureds' foundation rested was the primary source of the problem. Experts for the insureds did not refute USAA's evidence

---

[6] We, therefore, do not reach the issue of whether there is evidence to support the jury's finding that Southland acted with "actual awareness of the falsity, deception, or unfairness of the conduct in question."

regarding the excluded perils. They did, however, challenge the conclusion drawn regarding the effect of the plumbing leaks, and claimed instead that the leaks could not be excluded as a contributing cause of the damage. *Id.* at 302.

At trial, the jury was asked to determine whether perils excluded under the policy caused the damage. The jury was also charged with determining whether "accidental discharge, leakage, or overflow of water from within a plumbing system" contributed to the damage. The jury answered both questions affirmatively and found that thirty-five percent of the damage was caused by plumbing leaks. In its motion for judgment notwithstanding the verdict, USAA asserted its entitlement to judgment on several grounds, including that even if damage caused by a plumbing leak is covered, the insureds failed to produce any evidence to demonstrate what portion of the loss was caused solely by the plumbing leak. The trial court disregarded the jury's answer to question two, granted USAA's motion for judgment notwithstanding the verdict, and entered a take-nothing judgment in favor of USAA.

On appeal, a panel of this court concluded the record contained evidence from which the jury could conclude that plumbing leaks had contributed to the loss. *Id.* at 303. However, the insureds' engineers could not indicate the extent to which this peril damaged the home, and this was "fatal" to the insureds' claim. *Id.* at 304. This court held there was no basis from which the jury could reasonably infer that thirty-five percent of the damage was caused by the plumbing leaks. *Id.* "The jury heard no testimony regarding how much of the . . . damage was caused by the plumbing leaks. It learned only that plumbing leaks were found." *Id.* Because there was no evidence upon which the jury could determine that thirty-five percent of the damage was caused by plumbing leaks, this court concluded the trial court properly granted a take-nothing judgment in favor of USAA.

Here, there was no dispute that damage from a hailstorm was a covered peril and the jury was not presented with other possible excluded perils. Instead, in this case, the only dispute was the extent of the damage caused by the covered peril, and the evidence went beyond merely informing the jury that hail damage was "found." Unlike in *Wallis*, the jury heard testimony regarding how much of the Cantus' damage was caused by the hailstorm: the Barton report itemized the damage and the Cantus and Boutin testified that *all* of the itemized damage was caused by hail. Southland's expert claimed some of the damage he saw—when he went to the house two years after the hailstorm—was caused by "chronic water damage" such as from air conditioning condensation drainage or the use of water sprinklers. Therefore, unlike in *Wallis*, the jury here was not required to guess what percentage of the damage was caused by the hailstorm; instead, the jury was faced with a credibility question: the Cantus claimed all the damage itemized in Barton's report was due to hail, while Southland claimed some of the damage was caused by ordinary wear and tear. The jury apparently believed the Cantus and their expert, and we defer to that determination. Accordingly, we overrule Southland's third issue.

## ATTORNEY'S FEES

In its fifth issue, Southland asserts the award of attorney's fees should be reversed for the following reasons: (1) there is no recovery for breach of contract or violation of the Insurance Code, and (2) the Cantus failed to make a pretrial disclosure of the manner of calculation of the fees in response to a request for disclosure. Because we overrule Southland's complaint regarding the Cantus' breach of contract claim, the Cantus are entitled to attorney's fees. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 38.001(8) (West 2008) ("A person may recover reasonable attorney's fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for . . . an oral or written contract.").

- 25 -

As to Southland's second argument, SAS-Lowery's pretrial request for disclosure asked the Cantus for "the amount and any method of calculating economic damages." *See* TEX. R. CIV. P. 194.2(d) ("A party may request disclosure of . . . the amount and any method of calculating economic damages."). In response, the Cantus stated they would "be seeking the following damages": (1) actual damages, (2) compensatory damages, (3) mental anguish, (4) attorney's fees, and (5) punitive, exemplary, and/or treble damages. In response to a question regarding the identity of any testifying expert, the Cantus stated they might call Matthew Pearson or Marc Gravely, who would "testify about the reasonable and necessary attorney's fees incurred by [the Cantus] in prosecuting this action. [The Cantus'] counsel does not keep detailed billing records for contingent fee cases but generally charges [sic] $250.00 an hour for insurance cases of this type." On appeal, Southland contends that despite its Rule 194.2(d) request, prior to trial the Cantus never disclosed any amount of attorney's fees accrued or gave any means by which the fees would be calculated. Southland argues that because the Cantus failed "to make, amend, or supplement a discovery response in a timely manner [they] may not introduce in evidence the material or information that was not timely disclosed, or offer the testimony of a witness (other than a named party) who was not timely identified . . . ." *See* TEX. R. CIV. P. 193.6(a).

We disagree with Southland. The Cantus' response to the discovery request identified the attorneys and stated that the attorneys did not track their hours in contingent fees cases, but for insurance cases such as the one here charged $250 per hour. Under the circumstances of this

case, we conclude this response was sufficient.[7]  Therefore, the trial court did not abuse its discretion by allowing the Cantus' attorney to testify about his fees.

## MOTION TO COMPEL APPRAISAL

After the lawsuit was filed, Southland asked the Cantus to submit to an appraisal process to determine the amount of damage that occurred in the hailstorm.  The Cantus did not respond and Southland filed a motion to compel, which the trial court denied after a hearing.  At trial, the court excluded evidence offered by Southland of the Cantus' alleged refusal to participate in the appraisal process.  In its sixth issue, Southland asserts the trial court erred by denying the motion for an appraisal and excluding the evidence at trial.

Appraisal provisions are included in most property insurance policies and are enforceable.  *See State Farm Lloyds v. Johnson*, 290 S.W.3d 886, 888 (Tex. 2009).  However, "[p]rovisions of an insurance policy requiring proof of loss and appraisal are inserted for the insurer's benefit and may be waived by it."  *Int'l Serv. Ins. Co. v. Brodie*, 337 S.W.2d 414, 415 (Tex. Civ. App.—Fort Worth 1960, writ ref'd n.r.e.).

Waiver is ordinarily a question of fact, but when the facts are admitted or clearly established, it becomes a question of law.  *Tenneco, Inc. v. Enter. Prods. Co.*, 925 S.W.2d 640, 643 (Tex. 1996); *cf. In re Acadia Ins. Co.*, 279 S.W.3d 777, 780 (Tex. App.—Amarillo 2007, orig. proceeding) (denying mandamus relief where trial court resolved factual dispute concerning whether insurer waived its right to appraisal).  Here, there does not appear to be any disagreement about the facts concerning the actions leading to Southland's demand for an

---

[7] "[A]ttorney fees are not economic damages."  *McCarthy v. Padre Beach Homes, Inc.*, No. 13-01-846-CV, 2003 WL 22025858, at *4 (Tex. App.—Corpus Christi Aug. 29, 2003, no pet.) (mem. op.); *see also* TEX. GOV'T CODE ANN. § 25.0003(c) (West 2004) (excluding attorney's fees from calculation of county court's jurisdictional amount in controversy).  Damages are defined as compensation in money imposed by law for loss or injury.  *Geters v. Eagle Ins. Co.*, 834 S.W.2d 49, 50 (Tex. 1992) (noting that statute allowed for recovery of both damages and attorney's fees, and because statute did not define "damages," court turned to dictionary definition).  "Recovery of attorney fees, on the other hand, is permitted by statute, rules of procedure, a contract between the parties, or equity."  *McCarthy*, 2003 WL 22025858, at *4.

appraisal. Therefore, we must determine whether the trial court correctly applied the law to these undisputed facts.

In a letter dated October 12, 2004 but not received by Southland until December 20, 2004, the Cantus "invoke[d] the appraisal process" because they believed "the funds that Colonial Lloyds Insurance Company estimated to repair [their] house are not sufficient." Hignight testified that Southland and Colonial Lloyds Insurance Company are not the same company and language in the letter that referenced the appraisal process was not language contained in the policy Southland issued to the Cantus. The letter ends with this sentence: "Please forward this information to the individual you choose to represent Southland Lloyds Insurance Company in this appraisal."

The Southland appraisal provision, and the language quoted in the October 2004 letter are identical in all but two respects. The first sentence of the Southland provision states: "If you and we fail to agree on the actual cash value, amount of loss, or the cost of repair, either can make a written demand for appraisal." The first sentence contained in the letter states: "If you and we fail to agree on the actual cash value, amount of loss, or the cost of repair *or replacement*, either can make a written demand for appraisal" (emphasis added). The letter also contains the following additional language not contained in the Southland provision:

> If you or we request that they do so, the appraisers will also set:
> a) the full replacement cost of the dwelling
> b) the full replacement cost of any other building upon which loss is claimed
> c) the full cost of repair or replacement of loss to such building without deduction
> for depreciation.

Southland never responded to the Cantus' letter. The Cantus filed suit almost one year later, on November 7, 2005. On April 9, 2007, Southland filed its motion to compel the

appraisal process, which was denied after a hearing. Southland did not attempt to obtain relief via a petition for writ of mandamus. Trial commenced in April 2009.

Silence or inaction for an unreasonable period of time may show an intention to yield a known right. *Tenneco*, 925 S.W.2d at 643-44 (finding waiver of operating agreement's terms by three-year silence after transfer of shares). However, "the date of disagreement, or impasse, is the point of reference to determine whether a demand for an appraisal is made within a reasonable time." *In re Slavonic Mut. Fire Ins. Ass'n*, 308 S.W.3d 556, 562 (Tex. App.— Houston [14th Dist.] 2010, orig. proceeding). Here, Southland received a copy of the letter in which the Cantus invoked the appraisal process on December 20, 2004. Southland never responded to this letter. The Cantus filed suit on November 7, 2005. Following this date, Southland waited another sixteen months to file its motion, which was almost two and one-half years after the Cantus' letter invoking the appraisal process.[8] For these reasons, we conclude the trial court did not err in denying Southland's motion for an appraisal.[9]

## BROAD-FORM DAMAGES QUESTION

In question number two, the jury was asked what sum of money would compensate the Cantus for damages to their home resulting from Southland's failure to pay for covered physical loss. The jury awarded $30,000. In its seventh and last issue, Southland contends this broad form question was error. Southland contends the jury's answer could have been based on

---

[8] We agree with Southland that it did not waive any error on the trial court's part by not filing a petition for writ of mandamus. However, Southland's not pursuing relief by mandamus is relevant to the issue of whether it waived its right to appraisal. The *Slavonic* court held that the insurance company had no adequate remedy by appeal because denying the right to an appraisal denied the insurance company "the development of proof going to the heart of its case . . . ." *Id.* at 564. Here, Southland did not file a petition for writ of mandamus, but instead continued with discovery and went to trial.

[9] Because we conclude the trial court did not err in denying Southland's motion for an appraisal, we do not address Southland's related complaint that the court erred by not allowing into evidence the Cantus' alleged refusal to participate in the appraisal process.

evidence that did not qualify as a covered loss, such as replacing all the drywall in a room because there was a water stain on the ceiling, or replacing all the siding when only two sides of the house were damaged. Southland asserts that without separate answer blanks as to each type of repair that the jury found amounted to a total of $30,000, it is impossible to tell what "losses" the jury included within the $30,000. Therefore, Southland concludes that under *Crown Life Ins. v. Casteel*, 22 S.W.3d 378 (Tex. 2000), it is deprived of any meaningful appellate review.

In *Casteel*, the trial court submitted a single broad-form question on the issue of Crown's liability to Casteel. The question requested a single answer on Crown's liability, which the jury answered affirmatively. *Id.* at 387. The Supreme Court concluded the trial court erred in submitting four of the five DTPA grounds for liability because the plaintiff did not have standing to bring those claims. *Id.* at 387-88. The Supreme Court held: "When a single broad-form liability question erroneously commingles valid and invalid liability theories and the appellant's objection is timely and specific, the error is harmful when it cannot be determined whether the improperly submitted theories formed the sole basis for the jury's finding." *Id.* at 389. Recognizing that broad-form submission should be used when feasible, the Court explained that granulated submission should be used when a liability theory is uncertain. *Id.* at 390. The Supreme Court later extended the *Casteel* holding to broad-form questions that commingle damage elements when an element is unsupported by legally sufficient evidence. *See Harris County v. Smith*, 96 S.W.3d 230, 235 (Tex. 2002). In that case, as to awarding damages to one plaintiff, the jury considered (a) physical pain and mental anguish, (b) loss of earning capacity, (c) physical impairment, and (d) medical care. *Id.* at 231. As to the other plaintiff's potential damages, the jury could consider (a) physical pain and mental anguish, (b) physical impairment, and (c) medical care. *Id.* at 232. The defendant objected to both questions, asked that the trial

court submit each damage element separately, and complained there was no evidence of loss of earning capacity as to the first plaintiff and no evidence of any physical impairment as to the second plaintiff. The Supreme Court concluded the trial court erred in overruling Harris County's objection to the charge, "which mixed valid and invalid elements of damages in a single broad-form submission, and that such error was harmful because it prevented the appellate court from determining 'whether the jury based its verdict on an improperly submitted invalid element of damage.'" *Id.* at 234.

We do not believe *Casteel* and *Harris County* apply here because the court's charge did not contain a broad-form damage question that commingled multiple damage elements or theories of recovery. Instead, we believe the analysis in *Matbon, Inc. v. Gries*, 288 S.W.3d 471 (Tex. App.—Eastland 2009, no pet.) applies. In that case, the plaintiffs sought future medical damages. At trial, the court admitted into evidence an expert's testimony that the plaintiffs would need a new home and the services of a financial advisor. The defendants objected that future medical expenses are limited to actual medical expenses, and therefore, the cost of a new home and the fees for a financial advisor are not recoverable as future medical expenses. *Id.* at 483. The Eastland Court of Appeals agreed with the defendants. The court then examined whether the error was harmful. Relying on *Casteel* and *Harris County*, the plaintiffs asserted the defendants waived this contention because they did not ask the trial court to include in the court's charge separate damage questions for each of the challenged items of future medical damages that the plaintiffs sought. The court of appeals concluded those cases were inapplicable because the court's charge did not contain a broad-form damage question that commingled multiple damage elements. *Id.* at 484. Because "[a] claim for future medical damages is a separate element of damages available to a personal injury claimant," the court rejected the

plaintiffs' contention that the future medical damages question should be broken down into separate sub-parts whenever some of the items sought to be recovered as future medical damages are challenged." *Id.*

Here, this is not a case where the single broad-form question commingled multiple damage elements or theories of recovery; for example, compensation for loss to the Cantus' home and mental anguish. Instead, the only type of damage submitted was compensation for physical damage to the home, which is a separate element of damages available to the Cantus. The jury had before it Barton's estimate, which itemized the damage and the cost to repair each line item of damage. Therefore, the trial court was not required to list all the various *types* of physical damage the Cantus alleged were caused by the hailstorm.

## CONCLUSION

The Cantus elected to recover under their bad faith claim, rather than their breach of contract claim. We conclude the evidence in support of the jury's bad faith findings is legally insufficient; therefore, we reverse the trial court's judgment on that claim and render a take-nothing judgment in favor of Southland on the Cantus' bad faith claim. However, because we overrule Southland's issue on the breach of contract claim, we render judgment in the amount of $30,000 in favor of the Cantus on that claim. Finally, because we overrule Southland's challenge to the award of attorney's fees, we render judgment in favor of the Cantus for the amount of fees as stated in the trial court's judgment. We remand this cause to the trial court for entry of a judgment that is consistent with this opinion and that includes a re-calculation of the award of prejudgment interest.

Sandee Bryan Marion, Justice